

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00600-CV

**IN THE INTEREST OF S.R.T.**, R.L.M., and M.S.G., Children

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-00098
Honorable Mary Lou Alvarez, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:     Luz Elena D. Chapa, Justice
Beth Watkins, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: December 27, 2023

AFFIRMED

Appellant M.M. appeals the trial court's order terminating her parental rights to her children, S.R.T., R.L.M., and M.S.G.[1]  She argues the evidence is legally and factually insufficient to support the trial court's best interest finding.  Because we conclude the evidence is legally and factually sufficient, we affirm the trial court's order.

### BACKGROUND

After confirming allegations M.M. had been exposing her children to alcohol abuse and domestic violence, the Texas Department of Family and Protective Services ("the Department") initiated emergency removal proceedings on January 21, 2022, seeking temporary managing

---

[1] To protect the identity of the minor children in this appeal, we refer to the parent and children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

conservatorship of the children and termination of M.M.'s parental rights. The Department also sought termination of the parental rights of the children's fathers, H.R.T. and D.V.G.[2] The trial court signed an emergency removal order naming the Department temporary sole managing conservator of the children. The Department then placed the children with R.L.M. and M.S.G.'s paternal aunt and her wife; it also created a family service plan for M.M. The plan required M.M. to contact the Texas Workforce Commission and find stable employment; actively participate in and complete parenting and domestic violence classes; find a supportive and positive community; complete a psychosocial assessment; and continue working with the Bexar County Drug Court or take an outreach assessment.

In June 2023, the case proceeded to a four-day bench trial after the Department determined M.M. did not complete her service plan and continued seeing D.V.G. The trial court heard testimony from several witnesses, including the Department caseworkers and the CASA volunteer assigned to the case, M.M., counselors who treated M.M., S.R.T.'s therapist, and the foster parents with whom the children had been initially placed. The trial court ultimately ordered M.M.'s parental rights terminated based on statutory grounds (D), (E), and (O) in subsection 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D) (knowingly placed or allowed child to remain in conditions which endanger physical or emotional well-being), (E) (engaged in conduct or knowingly placed child with persons who engaged in conduct which endangers physical or emotional well-being), and (O) (failure to comply with court-ordered service plan). It further found termination of M.M.'s parental rights was in the children's best interest. *See id*. § 161.001(b)(2). M.M. now appeals, challenging the legal and factual sufficiency of the trial court's best interest finding.

---

[2] Neither H.R.T. nor D.V.G. are parties to this appeal. The record shows H.R.T. died during the course of the proceeding, and D.V.G. executed an affidavit of voluntary relinquishment.

**STANDARD OF REVIEW**

An order terminating parental rights must be supported by clear and convincing evidence showing (1) the parent has committed one of the grounds for involuntary termination as listed in section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the child's best interest. *See id.* § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *J.F.C.*, 96 S.W.3d at 264. To determine whether this heightened burden of proof was met, we use a heightened standard of review to decide whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *see, e.g.*, *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *O.N.H.*, 401 S.W.3d at 683.

A legal sufficiency review of the evidence requires us to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *J.F.C.*, 96 S.W.3d at 266) (internal quotation marks omitted). We assume "the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266) (internal quotation marks omitted). We do not disregard undisputed evidence even if it does not support the trial court's finding; to do so would not comport with the heightened burden of proof by clear and convincing evidence. *Id.* (citing *J.F.C.*, 96 S.W.3d at 266).

Under a factual sufficiency review, we perform "an exacting review of the entire record" and consider disputed or conflicting evidence. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014); *J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.O.A.*, 283 S.W.3d at 345 (quoting *J.F.C.*, 96 S.W.3d at 266) (internal quotation marks omitted). Under both standards, the factfinder is the sole judge of the weight and credibility of the evidence. *See id*. at 346; *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam).

## BEST INTEREST

### *Applicable Law*

There is a strong presumption a child's best interest is served by keeping the child with the parent, and the Department has the burden to rebut this presumption with clear and convincing evidence. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re I.I.T.*, 648 S.W.3d 467, 476 (Tex. App.—San Antonio 2021, no pet.). In determining whether the Department has satisfied this burden, we consider whether the Department produced evidence of the statutory factors set forth in section 263.307(b) of the Texas Family Code[3] and the factors outlined in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[4] Neither the statutory factors nor the *Holley* factors are

---

[3] These factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child or the child's parents; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system is available to the child. *See id*.

[4] These factors are (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals

exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when the evidence shows the parental relationship endangered the child's safety." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.).

Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *C.H.*, 89 S.W.3d at 28. And "[a] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A best-interest analysis may [also] consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *Id.* Finally, we presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a).

### *Application*

### *Emotional & Physical Danger to the Children*

The Department produced evidence it became involved with the family after it received a referral M.M. had been abusing alcohol and exposing the children to domestic violence episodes. Department caseworker Bianca Martinez testified she was the removal worker, and she received allegations the children were living with M.M. and D.V.G., who were engaging in domestic violence and abusing alcohol. Martinez specified she received the referral after S.R.T. made statements at school describing M.M. as overconsuming alcohol and becoming violent toward

---

seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.*

D.V.G., R.L.M., and M.S.G., who was a newborn at the time. S.R.T. further indicated he was primarily responsible for caring for his siblings, and he did not feel safe at home. Martinez testified she interviewed S.R.T., and he told her M.M. had grabbed R.L.M. by her hair on one occasion and on another occasion, M.M. held M.S.G. upside down by his leg and swung him around after she had been drinking. Martinez further testified M.M. denied the allegations when confronted and told her she had not been drinking anymore because she was on probation "for an incident with alcohol." Martinez testified she ran a criminal history search on M.M., and the search revealed charges for marijuana possession, assault bodily injury, violation of a protection order, assault stalking, and reckless injury to a child; it also revealed M.M. had been convicted for every charge except one. Martinez did not specify which charge M.M. had not been convicted of. During Martinez's investigation, she also learned D.V.G. was under a no contact order prohibiting him from seeing M.M. Martinez's investigation further revealed S.R.T. had been regularly missing school because he did not want to leave his siblings alone with M.M. and wanted to "make sure they were safe." Martinez further added the Department had removed another child, who is not the subject of this case, from M.M.'s care due to allegations of domestic violence, substance abuse, neglectful supervision, and physical abuse.

The trial court also heard testimony from S.R.T.'s therapist, who confirmed S.R.T. had been living in an abusive household and responsible for protecting his siblings. According to the therapist, S.R.T. told her he witnessed M.M. and D.V.G. yell and hit each other often. As a result, he was afraid to leave his siblings alone with M.M. He indicated M.M. would yell at them, and on one occasion, she pulled one of his sibling's hair. The therapist further testified S.R.T. told her M.M. did not physically abuse him, but she and D.V.G. would direct physical violence at him by destroying his possessions, which would make him scared.

Accordingly, the evidence produced by the Department showed M.M. had a history of violence, which included criminal convictions. Such evidence weighs in favor of termination, and the trial court could have reasonably inferred such past conduct subjected the children to emotional and physical danger. *See In re M.L.C.*, No. 04-17-00459-CV, 2017 WL 6597828, at *5 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.) (concluding evidence showing Mother had history of criminal conduct subjected children to emotional and physical danger). This court has recognized evidence of a parent's history of domestic violence supports a trial court's best interest finding. *See In re A.H.*, No. 04-15-00416-CV, 2015 WL 7565569, at *7 (Tex. App.—San Antonio Nov. 25, 2015, no pet.) (mem. op.). "A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being." *Id*. (quoting *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *6 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.)) (internal quotation marks omitted). Additionally, "[c]riminal conduct, prior convictions, and incarceration affects a parent's life and her ability to parent, thereby subjecting her child to potential emotional and physical danger." *M.L.C.*, 2017 WL 6597828, at *5. And, finally, the evidence concerning the removal of another child from M.M.'s care weighs in favor of termination, and the trial court could have taken this history into account when considering the danger or potential danger to the subject children. *Id*. ("A fact finder may consider a parent's history with her other children in considering the danger or potential danger to a child.").

### *Emotional & Physical Needs of the Children/Parenting Abilities*

The trial court also heard testimony concerning whether M.M. was able to meet the children's physical and emotional needs and had adequate parenting abilities. When the children entered the Department's care, S.R.T. was underweight and missing school regularly. Testimony from several Department caseworkers, the CASA volunteer assigned to the case, and S.R.T.'s therapist established S.R.T. experienced anxiety and depression due to his stressful home

environment with M.M.  Specifically, the CASA volunteer testified he observed S.R.T.'s visits with M.M., and he stated S.R.T. played a "parentified" role during the visits; specifically, he watched S.R.T. prompt M.M. on how and when to care for the younger children.  Similarly, S.R.T.'s therapist testified S.R.T. had been "parentified" and expected to care for the children because according to S.R.T., M.M. "cares about her own life over her children."  In fact, during the third visit, M.M. told S.R.T. she was upset with him, and it was his fault the Department was involved with their family.  After this visit, S.R.T. stopped attending visitations and "expressed [an] extreme amount of anxiety in facing his mother again."

As to M.M.'s interaction with R.L.M. and M.S.G., the CASA volunteer testified although M.M. regularly attended visitations with them, "it was extremely difficulty for her to recognize the needs of her children throughout the visits."  He testified R.L.M., who was three years old at the time, was "parentified" when S.R.T. was not around, and R.L.M. would prompt M.M. when to feed M.S.G.  The CASA advocate testified it was difficult for M.M. to manage the children during the visits, and R.L.M. often exhibited aggressive behavior toward M.S.G.  M.M. also did not bring any items to care for the children during the visits, and she depended solely on the foster parents to provide diapers, wipes, snacks, and changes of clothes for the children.  On occasion, M.M. would bring toys for the children; however, the toys were not age appropriate.

Finally, the CASA volunteer testified when he addressed his concerns with M.M. regarding her parenting abilities, M.M. declined any assistance or therapy.  The CASA advocate also expressed concern to M.M. about her relationship with D.V.G., but she denied having a relationship with him.  However, the CASA volunteer noted he would see M.M. leave with D.V.G. after visitations, and other Department caseworkers testified they believed M.M. and D.V.G. continued seeing each other.  According to the CASA volunteer, M.M. was in complete denial of the Department's allegations concerning domestic violence and alcohol abuse, and she stated the

Department removed her children solely because of S.R.T.'s statements. The CASA volunteer concluded by stating he believed M.M. did not express any concerns for her children. Based on this evidence, the trial court could have determined M.M. was unable to meet the children's needs and lacked adequate parenting skills, weighing in favor of termination of her parental rights.

***Programs Available***

As to the availability of programs offered by the Department to assist M.M. and promote the best interest of the children, the record shows the Department prepared a service plan for M.M., and the trial court ordered M.M. to comply with the plan's requirements. A parent's compliance with a court-ordered service plan is relevant to a best interest analysis as it shows the parent's willingness to seek out, accept, and complete services as well as the parent's willingness and ability to effect positive changes within a reasonable time. *M.L.C.*, 2017 WL 6597828, at *5; *see also* TEX. FAM. CODE § 263.307(b)(10) (providing courts may consider willingness and ability of the child's family to seek out, accept, and complete counseling services); *id*. § 263.307(b)(11) (willingness and ability of child's family to effect positive environmental and personal changes within reasonable time); *Holley*, 544 S.W.2d at 371–72; *In re A.M.S.*, No. 04-18-00973-CV, 2019 WL 2194067, at *6 (Tex. App.—San Antonio May 22, 2019, no pet.) (mem. op.) ("A parent's non-compliance with the court-ordered service plan is probative with regard to a best interest determination."); *In re I.L.G.*, 531 S.W.3d 346, 355–56 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (pointing out a parent's failure to comply with a court ordered service plan goes to the best-interest determination).

Here, the Department produced several witnesses who testified M.M. did not comply with the plan. Specifically, Department caseworker Annabelle Arambula testified she reviewed the service plan with M.M., and she believed M.M. understood the importance of completing the plan. A copy of the service plan was admitted into evidence for the trial court to review. According to

Arambula, M.M. was living with D.V.G. at D.V.G.'s mother's house when she started services. She first engaged in the plan by taking parenting classes, but she never submitted a certificate of completion. She also began substance abuse treatment at Elite Counseling because she had a "drinking problem," but she was unsuccessfully discharged from the program. Arambula added, however, M.M. complied with submitting to random drug tests, and she was not concerned with M.M.'s results. But, on cross-examination, Arambula confirmed M.M. was not tested for alcohol use. With respect to M.M.'s requirement to take domestic violence classes, Arambula testified she started the classes in April 2022, but she did not know whether M.M. completed the classes.

Department caseworker Therese Cornwell took over the case by August 2022, and she testified between August 2022 and January 2023, M.M.'s level of engagement with the service plan declined. Initially, M.M. had been participating in parenting classes, completed a psychosocial evaluation, and was attending individual counseling; however, she continued to live with D.V.G. despite evidence he was under a no contact order. Cornwell testified she discussed her concern with M.M. about her living arrangement, but it did not change. Cornwell further testified M.M. had tested positive for alcohol in October 2022, had been unsuccessfully discharged from her drug and alcohol outpatient treatment program by July 2022, and never reengaged in a drug and alcohol treatment program. Cornwell further added M.M. had completed her domestic violence classes, but during the case, M.M. was involved in a new domestic violence incident, making Cornwell opine M.M. "did not learn very much" from the classes.

The Department also produced evidence showing M.M. engaged in therapy at different times during the case, but she failed to complete her required sessions. First, the Department heard testimony from Elizabeth Hixon, a counselor who began meeting with M.M. after M.M. had been admitted into an outpatient program in February 2022. She testified M.M. actively participated in group therapy, admitted she had been using alcohol and marijuana before her children were

removed from her care, but remained sober since the children had been removed. Hixon also testified M.M. tested negative when given a random drug test during the program. However, M.M. was unsuccessfully discharged in July 2022 after she failed to obtain a sponsor and did not verify whether she had been participating in twelve-step meetings. Hixon explained an important part of the program required participants to have a strong support system in place to help them with recovery, and sponsorship and twelve-step meetings were part of that process. Hixon testified she expressed the importance of these requirements to M.M. and extended the program to allow M.M. more time to complete the program successfully, but M.M. did not comply or attempt to reengage in the program.

The trial court also heard testimony from Yvette Longoria, a counselor who began treating M.M. and D.V.G. in June 2022. She testified they saw their relationship as "stressful" and "toxic," and M.M. told her she wanted to improve communication with D.V.G. and her relationship with her children. Longoria testified M.M. expressed interest in making changes to her life, but after three sessions, M.M. stopped attending therapy. She testified she unsuccessfully discharged M.M. two months later in August 2022. Accordingly, based on the testimony from Arambula, Hixon, and Longoria, the trial court could have inferred M.M. did not have the ability to motivate herself to utilize and complete the resources required to regain possession of her children. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In contrast, however, M.M.'s third counselor, Adriana Botero, testified M.M. was utilizing the services offered to her and making progress. Botero testified she began seeing M.M. in March 2023, and M.M. explained she had turned to alcohol and marijuana to cope with her depression and loneliness. According to Botero, M.M. recognized her level of alcohol consumption was the reason the Department removed her children from her home, and it made her a "negative role model for the children." Botero also testified M.M. had been in an unhealthy relationship with

D.V.G., but M.M. was not seeing him anymore. Botero testified except for two appointments, M.M. attended her weekly therapy sessions and expressed motivation to reunite with her children. Botero also testified she believed M.M. was in a mentally stable place and not under the influence of illegal drugs. She described M.M. as actively participating in her weekly sessions, meeting her service plan goals, and ready for discharge. The trial court could have determined, however, M.M.'s efforts were not made within a reasonable amount of time. *See In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[T]he factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination.").

***Parent's Excuses for Acts or Omissions***

At trial, M.M. denied the allegations concerning domestic violence and alcohol abuse. She testified she did not neglect or abuse her children, and she never had an issue with alcohol. She admitted she had been arrested for bodily injury to a child due to an incident with her daughter, who had been removed from her care in 2017, but she denied hitting her daughter. She explained the incident arose when she and her ex-partner had a disagreement, and the situation "escalated" when she hit her ex-partner, which resulted in another charge for assault bodily injury to a family member. M.M. explained she pled guilty to the charges because she "didn't want to go through the process of having to deal with my ex and fight custody over her because of this."

M.M. also testified she had been in a romantic relationship with D.V.G. starting in early 2019 until November 2022. She stated during their relationship, she was involved in an altercation with D.V.G. because D.V.G.'s mother accused her of not feeding and abusing her children. She also testified she was a victim of domestic violence, and D.V.G. had a "pending felony domestic violence charge." She continued to live with him, however, and they chose not to discuss their legal issues with each other. According to M.M., the Department never told her she had to end

her relationship with D.V.G., and she admitted she would bring D.V.G. to some of her visitation sessions to see the children. She claimed she ended their relationship by November 2022. When pressed whether she continued to see D.V.G. after November 2022, she stated she did not continue living with him, but she wanted him involved in the children's lives. As a result, they would visit the children together despite the no contact order. When asked whether her decision to continue seeing D.V.G. in this respect was a wise choice, she stated it was not. She was also unaware S.R.T had any anxiety about her relationship with D.V.G.

When asked about her service plan, M.M. admitted she did not complete it. She testified she intended to complete her outpatient drug treatment program, but she never did because she did not know if she would receive credit for completing it. She also testified she did not have a problem with alcohol, and she had not consumed it since New Years' 2022. However, she admitted she tested positive for alcohol in October 2022 and April 2023. She stated she had consumed it around those times because she was grieving H.R.T.'s death, who had suddenly passed away while living in Mexico during the proceeding. She also confirmed she did not complete her counseling sessions with any of her counselors due to "technical issues." She added, however, she had complied with most of the service plan requirements, and it was important to her to see her children.

Overall, based on this testimony, the trial court could have drawn an adverse inference against M.M. and determined M.M.'s excuses for her ongoing relationship with D.V.G. and decision not to complete her service plan weighed in favor of termination of her parental rights. *See In re A.J.D.-J.*, 667 S.W.3d 813, 824–25, 836 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (explaining trial court may draw adverse interest against parent who fails to provide valid excuses for acts or omissions). Furthermore, the trial court was free to conclude M.M.'s denial that she abused alcohol and subjected the children to domestic violence showed she failed to take

responsibility for her conduct. *See, e.g.*, *In re H.R.*, 87 S.W.3d 691, 701 (Tex. App.—San Antonio 2002, no pet.) (holding evidence sufficient to sustain rejection of proffered excuses where parent failed to take responsibility for conduct).

***Desires of the Children/Children's Ages and Physical and Mental Vulnerabilities/Plans Held by Foster Family***

At the time of trial, S.R.T. was fifteen years old and old enough to express his desires. In this case, the Department produced evidence showing S.R.T. did not want to reunite with M.M. and wanted to remain with his foster family permanently. Specifically, the trial court heard testimony from Department caseworker Myrna Calzada, who testified S.R.T. was "very vocal about his desires to be adopted[,] to remain with his caregivers[,] and not return home to his mother." *See* TEX. FAM. CODE § 263.307(b)(1) (child's age); *id.* § 263.307(b)(5) (whether child is fearful of living in or returning to home); *Holley*, 544 S.W.2d at 371–72 (desires of the child). She testified when she discussed the potential outcomes of the case with S.R.T., he "expressed that he did not want to return back home, that he wanted to be adopted." Department caseworker Morgan Nava-Munoz also testified S.R.T. "feels uncomfortable with being around his mother, and that he is unwilling to meet with her." When asked about S.R.T.'s bond with M.M., she described it as "estranged." Additionally, the trial court heard testimony from S.R.T.'s therapist, who testified S.R.T. had been exposed to a violent and toxic environment that had been emotionally stressful for him. He was constantly afraid M.M. was upset with him and would remind him it was his fault the family was not together. According to the therapist, M.M. had "parentified" S.R.T., and as a result, S.R.T. had developed a desire to care for and protect his siblings; he also exhibited a strong bond with them. The therapist further confirmed S.R.T. did not want to return home and would only return if the court required his siblings to return home so he could protect them.

With respect to S.R.T.'s current placement, the Department produced evidence S.R.T. was living with his siblings and their paternal aunt and her wife. According to S.R.T.'s therapist, S.R.T. was doing very well in the environment and felt safe. His aunts "have been very supportive," and have provided him a home where he feels comfortable doing everyday tasks; in his previous environment he was nervous and anxious due to the emotional stress he endured. The therapist further testified S.R.T. described his current living environment as giving him "a future," and he did not believe he had a future in M.M.'s home.

Turning to R.L.M. and M.S.G., R.L.M. was three years old and M.S.G. was one year old at the time of trial, and they were too young to express their desires. *See* TEX. FAM. CODE § 263.307(b)(1) (child's age); *Holley*, 544 S.W.2d at 371–72 (desires of the child). In such circumstances, courts, including this one, have held a fact finder may consider whether the children have bonded with their foster family, are well cared for by them, and have spent minimal time with the parent. *In re A.F.C.*, No. 04-17-00080-CV, 2017 WL 3159447, at *3 (Tex. App.—San Antonio July 26, 2016, no pet.) (mem. op.); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Here, the trial court heard testimony from R.L.M. and M.S.G.'s paternal aunt, who was currently fostering all three of the children. She testified she and her wife were bonded with the children, particularly M.S.G. because they had been caring for him since he was an infant. She testified the children were very attached to her and her wife, and when the children had to visit M.M., the children were "not ready to really go." After visits, they would "run out the door to" them. The CASA volunteer, who witnessed the visitations, also confirmed R.L.M. and M.S.G. were not bonded to M.M., and he testified they were not excited to see her when they attended visitations.

R.L.M. and M.S.G.'s paternal aunt also testified R.L.M. and M.S.G. were attending occupational therapy, speech therapy, and physical therapy, and they were "doing great." She explained there were concerns regarding R.L.M.'s level of speech when she came into their home, and "[s]he talks so much" now. Regarding M.S.G., they were concerned he was not responding to sounds, but his therapy had been helping. She testified the children were doing well in their home, and she and her wife were interested in immediately adopting all the children. Accordingly, this evidence weighs in favor of termination, and the trial court could have inferred the children were doing well in their current placement with the prospect of being adopted.

### Summation

After reviewing the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction termination of M.M.'s parental rights was in the children's best interest. *J.F.C.*, 96 S.W.3d at 266. Here, the evidence showed S.R.T. had been caring for his siblings while living in a physically and emotionally dangerous environment, and despite the Department's attempts at reunification, M.M. did not complete her service plan or show progress. Specifically, the evidence showed M.M. did not successfully complete her parenting classes or a substance abuse treatment program, and she did not show any behavioral improvement despite completing her domestic violence courses. The trial court also heard testimony indicating S.R.T. feared M.M., and the children were thriving in their current placement with relatives, who were interested in immediately adopting them. Accordingly, when considering M.M.'s conduct before and after the Department's removal of the children, we hold the evidence is legally sufficient to support the trial court's best interest finding. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied.) ("This court considers a parent's conduct before and after the Department's removal of the children.").

Moreover, after reviewing all the evidence, we conclude the evidence contrary to the trial court's finding is not so significant that a factfinder could not have formed a firm belief or conviction in favor of that finding. *J.F.C.*, 96 S.W.3d at 266. Although M.M. argues there was evidence she had completed part of her required services and denied using alcohol and remaining in a relationship with D.V.G., the trial court also heard testimony M.M. had a history of criminal convictions and involvement with the Department, which resulted in the removal of one of her children. The trial court also heard testimony M.M. did not effect positives changes or demonstrate adequate parenting skills within a reasonable amount of time. And, while the most recent Department caseworker highlighted M.M.'s improvement, the trial court, as the sole judge of the weight and credibility of the evidence, could have chosen to weigh the contrary evidence more heavily and could have formed a reasonable belief termination was in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold the evidence is also factually sufficient to support the trial court's finding termination of M.M.'s parental rights was in her children's best interest.

## CONCLUSION

Based on the foregoing, we affirm the trial court's order of termination.

Luz Elena D. Chapa, Justice